The judgment of the United States Customs Court is *affirmed*.

UNITED STATES *v.* PACIFIC BINDING LIBRARY Co. (No. 3853)[1]

United States Court of Customs and Patent Appeals, March 25, 1935

*Joseph R. Jackson*, Assistant Attorney General (*Ralph Folks* and *Marcus Higginbotham, Jr.*, special attorneys, of counsel), for the United States.
No appearance for appellee.

[Oral argument February 7, 1935, by Mr. Folks; submitted on record by appellee]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The United States has appealed from a judgment of the United States Customs Court, First Division, which sustained the protest of the importer with respect to the classification of and assessment of duty on certain colored morocco leather imported at the port of Los Angeles, in the form of whole tanned goat skins.

The collector classified the merchandise under the provisions of paragraph 1530 (d) of the Tariff Act of 1930 and assessed the same

[1] T. D. 47617.

with duty at 30 per centum ad valorem. The importer protested, claiming the merchandise to be dutiable under various provisions of the act, but chiefly relying upon its claim that the merchandise should have been classified under subdivision (c) of paragraph 1530 at 25 per centum ad valorem. The United States Customs Court held that the merchandise was dutiable at 25 per centum under said paragraph 1530 (c) as claimed by the importer.

The two involved subdivisions of paragraph 1530 follow:

(c) Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of animals (including fish, reptiles, and birds, but not including cattle of the bovine species), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem; vegetable-tanned rough leather made from goat or sheep skins (including those commercially known as India-tanned goat or sheep skins), 10 per centum ad valorem; any of the foregoing if imported to be used in the manufacture of boots, shoes, or footwear, or cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear, 10 per centum ad valorem.

(d) Leather of all kinds, grained, printed, embossed, ornamented, or decorated, in any manner or to any extent (including leather finished in gold, silver, aluminum, or like effects), or by any other process (in addition to tanning) made into fancy leather, and any of the foregoing cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear, all the foregoing by whatever name known, and to whatever use applied, 30 per centum ad valorem.

In the report of the collector is found the following: "Description of merchandise and assessment: Colored leather @ 30%." The answer to the protest by the appraiser states: "The merchandise herein protested consisted of colored morocco leather properly classified as returned in the opinion of this office."

Collective Exhibit 1 consists of a number of colored pieces of leather cut from whole tanned goatskins. Each sample in the exhibit is in a different plain color—blue, maroon or black.

The issue as tried out in the trial court seemed to be chiefly confined to the question as to whether or not the leather had been grained within the meaning of said paragraph 1530 (d). The Government contends that it has been grained, and also that it has been "by any other process (in addition to tanning) [to wit dyeing] made into fancy leather."

We think it is shown by the record that the grain on the imported leather is the natural grain, and that it has not been "grained, * * * in any manner or to any extent" as is provided in the paragraph.

The record shows that this leather has been stretched and dyed and specially prepared for bookbinding use, and that while it is almost exclusively used for bookbinding, it might be used "for novelties, like the corners of a blotter pad"; that if leather was intended to be used for shoes it would be impossible to use it for bookbinding; for the

reason that "you would not be able to imprint letters in gold on that leather"; that if it was intended for shoes it would have to be specially treated for that purpose and that the leather at bar lacks the necessary oil and grease to make it suitable for shoes; that the importation at bar was originally tanned in Africa and "then, when it is brought to England, it gets a retannage where it is thoroughly worked up"; that it has not been treated with any ingredient which would shrink the leather to bring out the grain. The only witness in the case stated that the leather was plain and was made to sell at the least expense possible. There is no contention here that a commercial meaning, differing from the common meaning, of any term used in the statute has been proved.

The collector's classification of the leather at bar under paragraph 1530(d) is a finding by the collector that it is fancy leather, and we must also conclude that the collector found that the leather possessed such characteristics and use, and had been so processed (in addition to tanning) as to bring the same within said fancy leather provision. We do not think that the importer has shown that the classification of the collector was erroneous.

The importer's witness, testifying concerning the leather, among other things said that "then, when it is brought to England, it gets a retannage where it is *thoroughly worked up.*" (Italics ours.) Just what the witness meant by the term "thoroughly worked up" is not disclosed by the record. It might have been worked up by some process which made it into fancy leather. Certainly this character of testimony does not negative the finding of the collector. Moreover, the witness very positively stated that he knew that the leather had been specially prepared for bookbinding use. He did state, however, that there had been no "fancy effect or process applied to it", but the witness did not explain what he would regard as a fancy effect or process. The witness did not undertake to say whether or not the special preparation given the leather for bookbinding use was done after tanning or before.

The collector's classification of the leather as fancy leather would seem to be in harmony with certain legislative history relating to the provision which we will hereinafter refer to. The language of paragraph 1530(d), which includes the term "made into fancy leather", was not in the Tariff Act of 1922. The term "fancy leather" had frequently been used by the courts in their decisions involving leather. We find in no prior tariff act the term having been used in the sense that it is used in paragraph 1530 (d). Paragraph 1530 seems to be a very comprehensive paragraph and was intended to cover all kinds of leather and certain leather articles which had been provided for in a number of paragraphs of the Tariff Act of 1922. See *United States* v.

*John B. Stetson Co.*, 21 C. C. P. A. (Customs) 3, T. D. 46319. Paragraph 1530 was in H. R. 2667 when it passed the House of Representatives.

Congress did not in the act, nor did the committees of Congress in their reports, define what was meant by "fancy leather." An examination of many authorities on leather fails to reveal any definition of the term "fancy leather" which is satisfactory or is controlling of the question at bar. The term, however, had been used in a very broad sense, prior to the passage of the Tariff Act of 1930, in various statistics involving importation, manufacture, etc. of leather, and in numerous articles written on the subject of leather. No exact line between fancy leather and a number of other kinds of leather has been drawn except in the particulars hereinafter set out. The most pertinent expressions on the subject which we have found come from the United States Tariff Commission. Since the reports of this commission to Congress are used as an aid in the preparation of legislation, we think that they are, under the circumstances of this case, worthy of very careful consideration. In Tariff Information Survey N-17 "Light Leathers, Group II", which was prepared in 1922, there is quite an extended discussion of the term "fancy leather", some of which discussion has, we think, a bearing upon the question at bar. We quote:

## FANCY LEATHER

### SUMMARY

Fancy leather, sometimes called "specialty and general utility leather", is used for small leather articles and novelties and is made of lightweight skins of many different kinds. The principal variety used is sheepskin; considerable amounts of goatskin and calfskin are also used, and small quantities of genuine seal, walrus, and alligator skins. Russia calf, morocco, Levant, pigskin, and various kinds of fishskin leathers come within this classification. The skins of frogs, toads, and eels are sometimes used, and porpoise hide is also tanned into leather for fancy articles. A great deal of leather known as fancy is made of sheepskin or cowhide and embossed with an artificial grain. Such leather is very useful for making women's hand bags, pocketbooks, jewelry cases, and similar articles, and, though much less expensive than the genuine, it is often nearly or quite as good for these purposes.

Such miscellaneous hides and skins are necessarily manufactured into leather by many different methods. Vegetable tanning is the rule, and quebracho and sumac are among the extracts that are most often used in the process of production. Sumac gives a light color to the leather which adapts it for dyeing in delicate shades. Alum tawing and oil tanning are frequently employed in the manufacture of light skins. There are many special processes, such as those used in the manufacture of Russia leather, which derives its peculiar odor from birch bark used in tanning, or from birch oil sprayed on the grain. Morocco is sumac-tanned goatskin; large quantities of sheepskin are used for the manufacture of imitation morocco, the grain being embossed on the leather.

\*  \*  \*  \*  \*  \*  \*

Other fancy leathers are morocco (goatskin tanned with sumac); Levant skin, which is morocco of a large, coarse grain; pigskin and alum-tanned or tawed sheepskin.   *   *   *   A great variety of tannages are used in producing different kinds of fancy leather.

In the Summary of Tariff Information, 1929, which was prepared by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives, at page 2044 under the heading:

SEAL, SHEEP, GOAT, AND CALF LEATHER, DRESSED AND FINISHED, OTHER THAN SHOE LEATHER

considerable information concerning fancy leather was furnished and a number of the decisions with respect to such leather were cited and briefly discussed.   We find there the following pertinent language:

DESCRIPTION AND USES.—These leathers are known as "fancy leather" meaning leather other than shoe and glove leather.   Fancy leather is made principally of sheep and lamb skins, although calf, kid, seal, alligator, pigskin, and other leathers are included.   It is used principally for bookbindings, pocketbooks, cardcases, music rolls, belts, bag linings, and many novelties.

PRODUCTION.—The vogue for reptile or imitation reptile leathers for shoes or for trimming shoes has increased the production of fancy kid and fancy calf leathers.   Large quantities of calf and kid leather have been produced with imprinted patterns of reptile grains.   Fancy calf and kid has been produced in a great variety of pattern, color, and shade.   *   *   *

From the foregoing it is to be observed that it would be very difficult for this court to definitely point out everything which Congress intended to include and not to include in the term "leather of all kinds   *   *   *   [which is] by any other process (in addition to tanning) made into fancy leather", and it is not our present purpose to so construe the term as to precisely fix its boundaries.

On the record before us, we must hold that the importer has not established that the collector's classification was erroneous.   The protest should have been overruled.   The judgment of the United States Customs Court is *reversed*.